UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| TYLER HARRINGTON,<br><br>                Plaintiff,<br><br>v.<br><br>JAMES LANCASTER<br>JARED LINDSAY, and<br>NATHANIEL CANO,<br><br>                Defendants. | Case No. 4:24-c v-366<br><br>JURY DEMAND |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

### NATURE OF THE CASE

1.  This is a civil rights case about three Harris County Constable Officers ("Defendants") who responded to a phone call about a knock on a door, ignored every sign that they were at the wrong house, illegally entered that wrong house with guns drawn, and held a man at gunpoint while he stood dazed in his underwear.

2.  The incident began when Defendant Lancaster of the Harris County Constable's Office (Precinct 2) responded to a phone call from a woman, Mrs. H,[1] who thought she heard a knock at her back door. After speaking with Mrs. H and searching her property, Defendant Lancaster left the property. He returned less than thirty minutes later in response to additional calls regarding the same property.

---

[1] In order to respect the privacy of the neighbors of Mr. Tyler Harrington, the Plaintiff in this case, their names are shortened to "Mrs. H," "Mr. H," and "Mr. S." Mr. H, the neighbor, is not to be confused with Mr. Harrington because both their last names start with "H."

1

3. When Defendant Lancaster returned, Defendants Jared Lindsay and Nathaniel Cano – also of the Harris County Constable's Office (Precinct 2) – had already arrived. Except instead of standing in front of the correct house that Defendant Lancaster had already searched, they were at the house across the street (9818 Sagemark Drive). This house belonged to Mr. Tyler Harrington, the Plaintiff in this case.

4. Although the neighbor's son, Mr. S, mistakenly told dispatch "I think it's 9818 Sagemark," Mr. H, the husband of Mrs. H, had correctly told dispatch that his address was 9819 Sagemark Drive. Mr. H also told dispatch that the police had already been to his house. Defendant Lancaster told the other Defendants he had already met Mrs. H in person, and searched her home, at the house across the street from Mr. Harrington's.

5. Yet, despite the fact that Defendant Lancaster had already been to Mrs. H's property for the same reported facts, and despite the fact that the Defendants knew that the dispatch had received multiple phone calls, Defendants did not return to Mrs. H's property, confirm the address, or seek any other clarification.

6. Defendants Lancaster, Lindsay, and Cano approached Mr. Harrington's house. Defendant Lancaster went to the back of the house. Defendants Lindsay and Cano stayed at the front door.

7. Prior to entering Mr. Harrington's home, Defendants did not knock.

8. Prior to entering Mr. Harrington's home, Defendants did not announce their presence.

9. Prior to entering Mr. Harrington's home, Defendants did not wait for the caller to return, despite knowing she was on her way back.

10. Instead, they drew their guns, opened the door, and walked in.

11. Defendants Lindsay and Cano entered first. They walked down hallway with their guns drawn. They found Mr. Harrington and his wife asleep in their bed. Defendant Lindsay asked

2

Defendant Cano, "Did they give us the right address?" to which he replied in a whisper, "I don't know." The two Defendants retreated to the front door. Instead of staying outside to radio dispatch or take other steps to confirm the address, they knocked for the first time, announced their presence, and then *reentered the home with their guns still drawn*.

12. Mr. Harrington and his wife emerged from their bedroom, dazed, terrified, and barely clothed in underwear and a thin nightgown, respectively.

13. Defendants Lindsay and Cano did not apologize, leave, or explain what they were doing. Upon hearing the interaction between Defendants Lindsay and Cano, Defendant Lancaster entered from the back door with his gun drawn, screaming at Mr. Harrington and his wife.

14. All three Defendants pointed their guns at Mr. Harrington and his wife, yelling at them to keep their hands up, and badgering them about whether they lived in the house.

15. When the Defendants finally checked the address with dispatch, dispatch confirmed they had entered the wrong home. Defendants then chastised Mr. Harrington and his wife about locking their doors.

16. Defendant's unlawful entry, search, seizure, and use of excessive force has caused lasting psychological damage to Mr. Harrington. Even now, he continues to suffer serious psychological and emotional consequences.

17. Mr. Harrington now brings this action under 42 U.S.C. § 1983 to seek redress for Defendants' violation of his constitutional rights.

## PARTIES

18. Plaintiff Tyler Harrington is a 39-year-old man and father to three young children. He works full-time as a Court Interpreter in Houston, Texas. He has worked as an interpreter since 2014. He is a resident of the State of Texas.

19. Defendant James Lancaster is a police officer in the Harris County Constable's Office, second precinct. He has worked as a police officer for six years, and as a police telecommunications operator for eleven years. He is sued in his individual capacity.

20. Defendant Nathaniel Cano is a police officer in the Harris County Constable's Office, second precinct. He has worked as a police officer for over six years. He is sued in his individual capacity.

21. Defendant Jared Lindsay is a police officer in the Harris County Constable's Office, second precinct. He has worked as a police officer for over eleven years. He is sued in his individual capacity.

## JURISDICTION AND VENUE

22. Mr. Harrington brings this action under the Fourth Amendment to the United States Constitution, as authorized by 42 U.S.C. § 1983.

23. The Court has jurisdiction over Mr. Harrington's claims under 28 U.S.C. §§ 1331 (action arising under the Constitution and federal law) and 1343(a) (action to redress deprivation of civil rights).

24. Venue is proper under 28 U.S.C. § 1391(b) because one or more Defendants reside in this judicial district and all Defendants are residents of Texas, or, alternatively, because a substantial part of the events or omissions giving rise to Mr. Harrington's claims occurred in this district.

## STATEMENT OF FACTS

### I. Defendants Responded to 9-1-1 Calls Concerning the Home of Mrs. H – Mr. Harrington's Neighbor (9819 Sagemark Drive).

25. On September 24, 2022, at 11:48 P.M., a woman residing at 9819 Sagemark Drive, Houston, TX called law enforcement to report that she heard knocking on her back door while she was home alone. Her name is Mrs. H.

26. 9819 Sagemark Drive is the residence of Mrs. H's family. This complaint refers to the H family's home as "the H residence."

27. Across the street from the H residence is Mr. Harrington's home: 9818 Sagemark Drive.

28. Next door to the H residence is 9823 Sagemark Drive. 9823 Sagemark Drive is the home of the S family. This complaint refers to this address as "the S residence."



29. Defendant James Lancaster, a police officer with the Harris County Constable Second Precinct, responded to Mrs. H's call.

30. Defendant Lancaster arrived at 9819 Sagemark Drive, the H residence.

31. Defendant Lancaster spoke with Mrs. H face-to-face at her home.

32. Defendant Lancaster inspected the back of the H residence. Then he inspected the front of the house. He found nothing.

33. While standing outside of her home, Mrs. H told Defendant Lancaster that her daughter was going to send her boyfriend over to check on the house.

34. Mrs. H informed Defendant Lancaster that she might get in her car and drive around until others came home. Mrs. H eventually left.

35. Defendant Lancaster left the H residence at 12:10 A.M. on September 25, 2023.

36. Defendant Lancaster spent approximately twelve minutes conducting an investigation at the H residence.

37. At some point after Defendant Lancaster left the H residence, Mrs. H's daughter and her boyfriend arrived at the H residence just like Mrs. H had informed Defendant Lancaster they would. They arrived in a black truck.

38. Mr. H observed the truck remotely through a security camera.

39. Mr. S, the son of neighbors at 9823 Sagemark Drive, also observed the truck remotely on camera.

40. Neither Mr. H nor Mr. S were physically present on Sagemark Drive at the time.

41. Mr. S called sheriff's dispatch and reported the truck. When dispatch asked for the address of the H residence, Mr. S stated, "I think it's 9818 Sagemark. My parents live next door, its 9823."

42. 9818 Sagemark Drive is not next door to 9823. The correct address for the H residence is actually 9819 Sagemark Drive.

43. 9818 Sagemark Drive is the house across the street from both the H residence and the S residence.

44. 9818 Sagemark Drive is Mr. Harrington's residence.

45. While on the phone with Mr. S, dispatch also received a call from Mr. H.

46. Mr. H correctly informed dispatch that he was the resident of "9819 Sagemark."

47. Mr. H correctly informed dispatch that the "cops came earlier." He added that there were now people at his house.

48. Mr. H asked dispatch to send someone to the H residence.

49. At this point, dispatch sent officers to 9818 Sagemark, the incorrect address.

50. Because Defendant Lancaster had just spoken to Mrs. H face-to-face outside of her home for approximately twelve minutes, he knew or should have known that 9818 Sagemark – Mr. Harrington's house – was not the correct building. *See supra* ¶¶ 30-36.

51. Dispatch completed the call with Mr. S, the neighbor, and returned to speaking with Mr. H, the homeowner of 9819 Sagemark.

52. Mr. H communicated that his wife had left the house because she was scared. When dispatch offered to have the officers "clear the house," Mr. H asked that the police car wait in front of his house until his wife returned.

53. Dispatch said she couldn't guarantee the officers would wait, and Mr. H, who had previously identified himself as the owner of 9819 Sagemark, responded, "Okay, I'll let them come and clear the house, let me call her and tell her to meet them at home."

54. Dispatch contacted an officer and told him that the "homeowner is going to send his wife back to the house, they would like you to clear the house for them." The officer copied.

55. Dispatch recorded the following message in the event recorder: "REPT IS SENDING HIS WIFE BACK TO THE HOME, TO LET DEPUTIES CLEAR THE HOME 12:38:03 AM".

7

**II. Defendants Unlawfully Entered and Searched Mr. Harrington's Home Without Consent.**

56. Less than thirty minutes after inspecting Mrs. H's home and speaking with her outside of it, Defendant Lancaster returned to Sagemark Drive at approximately 12:37 A.M. Two officers with the Harris County Constable Second Precinct, Defendants Jared Lindsay and Nathaniel Cano, were already in front of 9818 Sagemark Drive (Mr. Harrington's residence).

57. Defendant Lancaster pointed at the H residence across the street and stated to Defendants Lindsay and Cano "that's the house with the person knocking on the back door, that was the house earlier. . . I checked the one across the street."

58. In reference to the Harrington residence, Defendant Lancaster stated he had "never been to this house."

59. Defendant Lancaster knew that dispatch was often overwhelmed and made mistakes. Yet he did not radio dispatch to confirm the address.

60. Defendants searched the back and front yards of Mr. Harrington's home.

61. Defendants tried opening the back door of the Harrington residence. It was unlocked.

62. A fourth officer arrived on Sagemark Drive, and Defendant Lancaster told him they were "waiting on the owner."

63. Defendants tried opening the front door of the Harrington residence. It was unlocked.

64. Dispatch radioed the Defendants to check in. Defendant Lancaster stated that everything was "under control" and again stated that they were "waiting on the homeowner" at 12:42:49 A.M.

65. Defendant Lancaster did not respond by asking dispatch to confirm the address.

66. Defendant Lancaster did not respond by asking dispatch to clarify why he was entering a different house than the H residence, which he had inspected earlier.

67. In fact, at no point prior to entering the home did Defendant Lancaster ask dispatch to confirm the address.

68. At no point prior to entering the home did Defendant Lancaster ask dispatch to clarify why he was at a different house than the house he had inspected earlier.

69. Defendant Lancaster described to the other Defendants that dispatch had received calls from the "homeowner" and the neighbor. He said that the high number of calls "means Jen is…" and made a motion indicating that she had a phone going in both ears, implying that she was getting overwhelmed.

70. Defendant Lancaster had spoken to Mrs. H, conducted an investigation at the H residence for approximately twelve minutes, and knew that Mrs. H had decided to take a drive and return home.

71. In other words, Defendant Lancaster knew or should have known that the homeowner for whom the Defendants were waiting was Mrs. H.

72. Approximately one minute later, dispatch informed the Defendants that there shouldn't be anyone in the house. Defendant Lindsay immediately responded that they would be "searching the home now, before she gets here."

73. Defendant Lancaster went to the back door while Defendants Lindsay and Cano stayed at the front door.

74. Defendants did not have a warrant to enter the house. Nor did they take any steps to procure one.

75. At 12:43:09 A.M., Defendants Lindsay and Cano drew their guns, opened the front door, and stepped into the house.

76. Defendants Lindsay and Cano entered Mr. Harrington's home without knocking and announcing, without a warrant, without consent, without probable cause, and without exigent circumstances.

77. After he had already entered the house, Defendant Lindsay shouted "constable's office, come up with your hands out!"

78. Defendants Lindsay and Cano walked further into the house with weapon-mounted lights, searching throughout.

79. Defendant Lindsay opened a closed bedroom door. He pointed his weapon-mounted light inside. As the beam of his light and barrel of his gun swept over the bed, he saw Mr. Harrington and his wife asleep in the bed.

80. Defendant Lindsay whispered, "There's somebody asleep on the bed. Did they give us the right address?" to which the Defendant Cano whispered, "I don't know."

81. Defendant Lindsay whispered "Back up to the entrance."

82. The two Defendants withdrew to the entrance. Defendant Cano exited the house while Defendant Lindsay stayed on the threshold of the entrance, pointing his gun into the living room.

83. At this point, Defendant Lindsay knocked on the door for the first time, shouting "constable's office, come out with your hands up!"

**III. Defendants Unlawfully Held Mr. Harrington and His Wife at Gunpoint in Their Home.**

84. Defendant Lindsay's shouting jolted Mr. Harrington's wife awake.

85. Mrs. Harrington walked out of the bedroom.

86. She was barefoot. She wore nothing more than a thin nightgown.

87. Mrs. Harrington was visibly unarmed.

88. While pointing his gun at her, one of the Defendants asked Mr. Harrington's wife if she lived there. She replied she did.

89. With his foot still on the threshold of the Harrington's door, Defendant Lindsay ordered her to grab her ID and to come out to the door. He radioed dispatch saying the home was occupied.

90. Defendant Lancaster then removed his gun from its holster and entered the home from the back door with his gun drawn. He began yelling, "Manos arriba, manos arriba!" which is Spanish for "hands up!"

91. Defendant Lancaster did not knock. He did not identify himself as a law enforcement officer. To the contrary, he simply entered and began searching Mr. Harrington's home with his gun drawn.

92. The other two Defendants crossed the threshold and re-entered the home, continuing to hold Mr. Harrington's wife at gun point.

93. Mr. Harrington woke up and walked out of the bedroom.

94. Mr. Harrington was barefoot and shirtless, wearing nothing but his boxer briefs.

95. He was visibly unarmed.

96. The Defendants also held Mr. Harrington at gunpoint.

97. Defendant Lancaster told Mr. Harrington, who was standing in his boxers with his hands raised, to "stay right there."

98. As Defendants continued to point their guns at Mr. Harrington and his wife, they questioned the couple about whether they lived in the home.

99. The couple —who the Defendants had just seen sleeping in bed seconds before— answered that they did live in the home.

100. Defendant Lancaster ordered Mr. Harrington's wife to follow him outside in her thin nightgown, still with her hands raised.

101. Defendant Lindsay again asked Mr. Harrington if he lived at the house, to which he responded he did.

102. Defendant Lindsay radioed dispatch, asking, "What's the address of the house we're actually supposed to be searching?" Dispatch did not immediately respond.

103. Dispatch asked Mr. H if his address was "9818." Mr. H then mistakenly responded, "Yes, 9818," but then accurately described the exterior of 9819.

104. Defendant Lancaster brought Mr. Harrington's wife back into the home with her hands still up.

105. Defendant Lindsay looked at her I.D., and then instructed Mr. Harrington and his wife to put their hands down. The Defendants holstered their guns at 12:46:03.

106. Defendant Lindsay explained that "someone had reported people searching the front and back doors of this house," and that the caller had said "the owner is not here." He again asked if the Harrington's were the homeowners, to which they again said yes.

107. Defendant Lindsay chastised Mr. Harrington and his wife for leaving their doors unlocked.

108. Defendant Lindsay once again asked dispatch for the address. Dispatch told him 9818 Sagemark, which is Mr. Harrington's address. Defendant Lindsay responded saying "I have people inside the house, they have identification that they live here. You might want to call the caller back and get them to give you the correct address again."

109. Hearing this interaction between Defendant Lindsay and dispatch. Mr. H frantically told dispatch, "Ma-am, it's 9819!" Dispatch then provided the correct address, 9819 Sagemark Drive.

12

110. The Defendants explained to Mr. Harrington and his wife that "someone gave us the wrong address" and that it was "actually supposed to be your neighbors." Defendant Lindsay again told Mr. Harrington and his wife to lock their doors "because when we see a door unlocked like that, we're gonna come in and make sure everybody's safe."

111. The Defendants crossed the street to search the H residence.

112. Looking over at Mr. Harrington's house around 12:53:20 A.M., Defendant Lindsay stated "oh yeah they're gonna complain . . . they're gonna complain . . . we scared them."

### IV. Defendants Knew or Should Have Known that They Had No Authority to Enter and Search the Harrington Residence

113. Defendant Lancaster, having already visited and searched the backyard of the H residence, knew or should have known that the Defendants were at the wrong house.

114. Defendants had received consent from Mr. H, who had identified himself as the owner of 9819 Sagemark Drive, to clear his house once his wife had returned. Defendants not only failed to wait for his wife to return, but also failed to search Mr. H's house. They searched Mr. Harrington's house instead.

115. Defendants had no probable cause to enter Mr. Harrington's home. The only information they had was a report that someone had knocked on the back door of a house. No reasonable officer could have believed there was probable cause to enter and search Mr. Harrington's house.

116. No exigent circumstances justified Defendants entry and search of Mr. Harrington's home. Defendants had only received a report of a knock at the door—not ongoing violent activity. The caller made clear that the homeowner had left and that no other residents were home, so there was no basis for concern about the residents' safety. Defendants had secured both the front and back door of the house, blocking channels of possible escape.

117. Nevertheless, Defendants entered and searched Mr. Harrington's home. Upon realizing that there were people asleep in the home, Defendants Lindsay and Cano exited, and then reentered the house, continuing to search.

118. Defendants' flagrant disregard for Mr. Harrington's constitutional rights subjected him to agonizing emotional pain, fear, severe and ongoing emotional injuries.

## V. Mr. Harrington Continues to Suffer Psychological Damages Caused by Defendants' Violations of his Rights

119. Mr. Harrington is a lawful gun owner and keeps a pistol in a lockbox by his bed.

120. On previous occasions that he has heard noises in the middle of the night, Mr. Harrington has drawn his gun to go check on those noises.

121. Fortunately, Mr. Harrington was so startled by the Defendants entering his home that he didn't have time to arm himself.

122. Mr. Harrington continues to be haunted by what might have happened had he grabbed his gun in response to unannounced strangers barging into his home in the middle of the night.

123. Mr. Harrington believes that had he reached for his firearm in self-defense, he would not be alive today.

124. Mr. Harrington's fears reflect a deadly reality: when police enter the homes of law-abiding gun owners like Mr. Harrington, all too often, the gun owners are killed. Mr. Harrington carries with him the knowledge that he was an arm's reach away from sharing the fate of Breonna Taylor[2] or the victims of the Harding Street Raid.[3]

---

[2] Oppel, Richard A., et al. "What to Know about Breonna Taylor's Death." *The New York Times*, The New York Times, 30 May 2020, www.nytimes.com/article/breonna-taylor-police.html.

[3] Barned-Smith, St. John. "Harding Street: Houston's Infamous No-Knock Raid, Explained." *Houston Chronicle*, 3 Aug. 2022, www.houstonchronicle.com/news/houston-texas/crime/article/Houston-Harding-Street-raid-Gerald-Goines-17345123.php.

125.    Mr. Harrington had been sleeping with earplugs on the night that the Defendants entered his home, which prevented him from hearing the Defendants initially enter his home. He has been afraid to sleep with earplugs since the incidents alleged in this complaint, which has affected his ability to sleep.

126.    Mr. Harrington works night shifts that sometimes only give him a window of less than five hours to sleep, often at irregular hours. It is difficult for Mr. Harrington to sleep during daylight hours without earplugs because he is the father of three young children who often wake up early. His fear of using earplugs has significantly impacted his ability to sleep and has affected his health.

127.    After the incidents alleged in this complaint, Mr. Harrington has felt anxious, nervous, and stressed whenever he lawfully carries his firearm. He fears that he might encounter the police, and that they might hurt or kill him if they realize he has a firearm on his person.

128.    After the incidents alleged in this complaint, Mr. Harrington always double-checks that his doors are locked before going to sleep. He checks them even after he knows that he has locked them. Mr. Harrington is not afraid that someone may attempt to burglarize his home. Rather, he is anxious that the police may unlawfully storm his home once again.

129.    After the incidents alleged in this complaint, Mr. Harrington has felt reluctant to call the police for help. He has felt nervous, anxious, and stressed whenever he must interact with the police.

<u>CLAIMS FOR RELIEF</u>

**COUNT I:**
**Unlawful Entry in Violation of the Fourth Amendment**
**42 U.S.C. § 1983**

130.    Mr. Harrington re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

131. Defendants Lancaster, Lindsay, and Cano entered Mr. Harrington's home without knocking and announcing, without a warrant, without consent, without probable cause, and without exigent circumstances, in violation of the Fourth Amendment.

132. Defendants Lindsay and Cano entered Mr. Harrington's home through the front door.

133. Defendant Cano entered the home through the front door twice.

134. Defendant Lancaster entered Mr. Harrington's home through the back door.

135. Defendants' actions were willful, deliberate, and malicious; involved reckless or callous indifference to Mr. Harrington's rights; and should be punished and deterred by an award of compensatory and punitive damages against Defendants as permitted by law.

### COUNT II:
### Unlawful Search in Violation of the Fourth Amendment
### 42 U.S.C. § 1983

136. Mr. Harrington re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

137. Defendants Lancaster, Lindsay, and Cano searched Mr. Harrington's home without knocking and announcing, without a warrant, without consent, without probable cause, and without exigent circumstances, in violation of the Fourth Amendment.

138. Defendants walked through Mr. Harrington's home with weapons-mounted lights.

139. Defendants opened Mr. Harrington's closed bedroom door.

140. Defendants asked Mr. Harrington at gunpoint if he lived in his home.

141. Defendants' actions were willful, deliberate, and malicious; involved reckless or callous indifference to Mr. Harrington's rights; and should be punished and deterred by an award of compensatory and punitive damages against Defendants as permitted by law.

## COUNT III:
### Unlawful Seizure in Violation of the Fourth Amendment
### 42 U.S.C. § 1983

142. Mr. Harrington re-alleges and incorporates by reference the allegations set forth above as if fully set forth herein.

143. Defendants ordered Mr. Harrington to put his hands up and held him at gunpoint while questioning him, thus seizing him in violation of the Fourth Amendment.

144. Defendants ordered Mr. Harrington to "stay right there" while questioning him at gunpoint, thus seizing him in violation of the Fourth Amendment.

145. As previously discussed, Defendants lacked reasonable suspicion or probable cause to seize him.

146. Defendants' conduct amounted to an unreasonable seizure of Mr. Harrington in violation of the Fourth Amendment.

147. Defendants' actions were willful, deliberate, and malicious; involved reckless or callous indifference to Mr. Harrington's rights; and should be punished and deterred by an award of compensatory and punitive damages against Defendants as permitted by law.

## COUNT IV:
### Excessive Force in Violation of the Fourth Amendment
### 42 U.S.C. § 1983

148. Mr. Harrington re-alleges and incorporates by reference the allegations set forth above as if fully set forth herein.

149. Defendants found Mr. Harrington asleep in bed. Nevertheless, Defendants woke him up by screaming at him and holding him at gunpoint while he wore only underwear. Defendants did so despite the fact that they were responding to phone calls concerning non-violent, non-emergency activity: knocking on a door, and despite the fact that they were present in Mr. Harrington's home

without probable cause. Their use of force against Mr. Harrington was unreasonable and amounted to a violation of the Fourth Amendment.

150. Defendants' excessive force in holding Mr. Harrington at gunpoint traumatized Mr. Harrington and caused psychological damage. He feels nervous, anxious, and stressed whenever he must interact with the police. He struggles to sleep since the incidents alleged in this complaint.

151. Defendants' actions were willful, deliberate, and malicious; involved reckless or callous indifference to Mr. Harrington's rights; and should be punished and deterred by an award of compensatory and punitive damages against Defendants as permitted by law.

### REQUEST FOR RELIEF

152. Defendants' flagrant disregard for Mr. Harrington's constitutional rights subjected him to agonizing emotional pain, fear, severe and ongoing emotional injuries. Mr. Harrington now asks the Court to enter a judgment confirming that Defendants are not above the laws they enforce.

153. WHEREFORE, on the basis of the foregoing, Mr. Harrington demands a jury trial for all issues so triable pursuant to the Seventh Amendment of the United States Constitution and Federal Rules of Civil Procedure, and requests that this Court issue the following relief:

   a. Declare that Defendants violated Mr. Harrington's constitutional rights;
   b. Award compensatory damages against Defendants in an amount to be determined by a jury at trial;
   c. Award punitive damages against Defendants for their willful and egregious violations of the law in an amount to be determined by a jury at trial;
   d. Award reasonable attorneys' fees, expenses, and costs of litigation pursuant to 42 U.S.C. § 1988 and other applicable law; and
   e. Award such other relief as the Court deems just and proper.

Respectfully submitted this 31st day of January, 2024,

/s/ Alessandro Clark-Ansani
Jeffrey D. Stein*
Texas Bar No.24124197; S.D. Tex. Bar No. 3600520
jeff@civilrightscorps.org
Kiah Duggins (pro hac vice forthcoming)
Washington, D.C. Bar No. 1779266
kiah@civilrightscorps.org
Alessandro Clark Ansani (pro hac vice forthcoming)
Washington, D.C. Bar No. 90018563
alessandro@civilrightscorps.org
1601 Connecticut Ave. NW, Suite 800
Washington, DC 20009
Telephone: (202) 844-4975

*Attorney in Charge